UNITED STATES DISTRICT COURT **A JURY TRIAL IS**
SOUTHERN DISTRICT OF NEW YORK **DEMANDED**

---

FR. ROBERT M. HOATSON,

       **AMENDED**
     Plaintiff,   **COMPLAINT**

  -against-     **CIVIL ACTION**
          **No.: 05-CV-10467**
NEW YORK ARCHDIOCESE, CARDINAL EDWARD EGAN, (Hon. Paul A. Crotty)
THE NEWARK ARCHDIOCESE, ARCHBISHOP JOHN J. MYERS,
CONGREGATION OF CHRISTIAN BROTHERS, FR. JOHN
O'BRIEN, BR. LAURENCE BOSCHETTO, BR. PAUL KEVIN
HENNESSY, THE ROMAN CATHOLIC DIOCESE OF ALBANY
and BISHOP HOWARD J. HUBBARD,

       Defendants.

---

   The plaintiff FR. ROBERT HOATSON, by and through his attorney, JOHN A.

ARETAKIS, does hereby state as and for an Amended Complaint against the defendants the

following:

**PARTIES, VENUE AND JURISDICTION**

   1.  The plaintiff FR. ROBERT M. HOATSON, (hereinafter "plaintiff") at all

relevant times material to the Complaint herein, is over the age of eighteen and is a resident of

the State of New York.

   2.  Upon information and belief, and at all times material to the Complaint, the

defendant NEW YORK ARCHDIOCESE (hereinafter, defendant "ARCHDIOCESE") is, upon

information and belief a non-profit organization or religious organization operating or doing

business in the State of New York, County of New York.

   3.  Upon information and belief, and at all times material to the Complaint, the

defendant CARDINAL EDWARD EGAN (hereinafter, defendant "CARDINAL") is a

priest/religious and the Cardinal and/or Metropolitan of the defendant NEW YORK

ARCHDIOCESE.

4.      Upon information and belief, and at all times material to the Complaint, the

defendant THE ROMAN CATHOLIC ARCHDIOCESE OF NEWARK (hereinafter, defendant

"ARCHDIOCESE") is, upon information and belief a non-profit organization or religious

organization operating or doing business in the State of New Jersey.

5.      Upon information and belief, and at all times material to the Complaint, the

defendant ARCHBISHOP JOHN J. MYERS, (hereinafter defendant "ARCHBISHOP") is a

priest and Archbishop and/or Metropolitan of the defendant NEWARK ARCHDIOCESE.

6.      Upon information and belief, and at all times material to the Complaint, the

defendant CONGREGATION OF CHRISTIAN BROTHERS (hereinafter defendant

"BROTHERS") is a religious order or organization and has offices for the practice of business

in the States of New Jersey and New York.

7.      Upon information and belief, and at all times material to the Complaint, the

defendant FR. JOHN O'BRIEN, (hereinafter "O'BRIEN") is or was a diocesan priest or

religious who resides at St. Pius X Roman Catholic Church in Scarsdale, New York and was

ordained in or around 1990.

8.      The defendant BR. PAUL KEVIN HENNESSY is and was currently a member

of the CONGREGATION OF CHRISTIAN BROTHERS, New Rochelle, New York who

resides in Venice, Florida.

9.      The defendant BR. JOSEPH M. CLARK is and was a member of the

CONGREGATION OF CHRISTIAN BROTHERS and is now deceased.

10.     Upon information and belief, and at all times material to the Complaint, defendant, BR. LAURENCE BOSCHETTO, (hereinafter "BOSCHETTO") was a member of the CONGREGATION OF CHRISTIAN BROTHERS and professed his first vows in 1974.

11.     The defendant HOWARD J. HUBBARD (hereinafter defendant "HUBBARD") is a bishop and ordained priest and is, upon information and belief, the leader of and employer or agent of the defendant and co-defendant ROMAN CATHOLIC DIOCESE OF ALBANY.

12.     The defendant THE ROMAN CATHOLIC DIOCESE OF ALBANY (hereinafter "ALBANY DIOCESE") is upon information and belief a non-profit organization or religious organization operating or doing business in the State of New York.

13.     Since June 2002, the defendants have publicly disclosed that dozens of priests and religious brothers been removed from active ministry due to sexual misconduct and the sexual abuse of children, and the number of priests and religious brothers so involved is significantly higher but for the protection and assistance of the defendants.  In addition, all or most of these removed priests and/or religious brothers are still being supported, assisted or receive stipends or benefits from the defendants DIOCESE and/or BROTHERS.

14.     This Court has subject matter pursuant due to the federal, statutory and common law claims and because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs and causes of actions are premised on federal statutes and pursuant to 28 USC 1330(a) and (b) et. seq and RICO Statutes involved.

15.     Venue is proper pursuant to 28 USC § 1391 when the defendants do business in this the Southern District and substantial or material parts of the events occurred within this District.

**FACTUAL ALLEGATIONS**

16.     The plaintiff FR. ROBERT HOATSON, currently a NEWARK ARCHDIOCESAN priest and former CHRISTIAN BROTHER claims retaliation and harassment due to the fact that Fr. Hoatson has been outspoken and critical of predatory priests/religious in the church and for the sexual abuse he suffered as a CHRISTIAN BROTHER, and most importantly for assisting victims of clergy sexual abuse for the last 3-4 years.

17.     The Vatican continues to describe homosexuality as a mental disorder when the Vatican is aware that over two-thirds of bishops, priests and religious in the United States are homosexual and are living homosexual lives.

18.     The plaintiff does not agree or allege (as does the Vatican) that homosexuality is a mental disorder and plaintiff believes that homosexuals should be afforded all gay and civil rights.  The Vatican and American churches' hypocrisy and fear of homosexuality issues is in part responsible for the atmosphere of clergy sexual abuse and retaliation against the plaintiff. Because so many are hiding their own secrets from the Vatican, bishops have been blackmailed into protecting predators and pedophiles in ministry, and the defendants have thus retaliated against the plaintiff.

19.     There is no connection between homosexuality and pedophilia, but sexual predators have been protected, concealed and affirmatively assisted by the defendants, those in power or positions of trust because such an overwhelming percentage of clergy and bishops are compromised by their own hypocrisy, or fear of blackmail by predators, and this helps understand and explain the retaliation against the plaintiff.

20.     From the day the plaintiff first entered religious life in or about 1970 to the time the plaintiff entered seminary in 1994 to the present day, the plaintiff has been enveloped in a culture of pedophilia, sexual and physical sexual abuse of children or vulnerable adults, and the criminal cover-up of same by the defendants.

21.     The allegations of abuse of the plaintiff serve as a basis to describe why and how the plaintiff has acted to expose predators and work with and help victims of clergy sex abuse, at least in the last 3-4 years.

22.     The plaintiff entered into the BROTHERS in 1970 where his first superior was BR. PAUL K. HENNESSEY, prior to that Br. Salvatore Anthony Ferro pursued him in high school while the plaintiff was a minor, placing the plaintiff in his senior English class against the plaintiff's will.  The plaintiff's cousin, James Craig Hoatson, had been sexually abused by another BROTHER, prior to this time at the same school.  James Craig Hoatson committed suicide by hooting a bullet into his own head and died in 1978.  When the Boston scandal erupted in 2002, the CHRISTIAN BROTHERS moved Ferro and made Br. Ferro disappear to avoid criminal and civil claims that existed.

23.     Upon information and belief, the CHRISTIAN BROTHERS are still hiding and protecting Br. Ferro from and avoiding criminal and civil prosecution because of the sexual abuse of boys, and this ongoing obstruction of justice and protection of predators continues presently.

24.     The plaintiff moved into the postulancy as a postulant in 1970 at St. Joseph's Hall and met BR. PAUL HENNESSY.  BR. HENNESSY became the plaintiff's second abuser, under the guise of trying to warm the plaintiff up because he was described by HENNESSY as a cold person.  HENNESSY continued to groom the plaintiff as the professed CHRISTIAN

BROTHERS gathered in his room to celebrate happy hour nightly while the postulants were engaged in spiritual reading.  The plaintiff asked of HENNESSY why did religious men needed to have a happy hour and get drunk every night before going to dinner, and the plaintiff was accused of being a prude.

25**.**     The defendant HENNESSY'S family were millionaires, and he utilized his vast wealth and the power of his position to abuse and manipulate the plaintiff and use his wealth in a manner so others would not accuse HENNESSY of sexual abuse.

26.     The plaintiff met BR. JOSEPH CLARK who was his novice master in 1971-72.  Plaintiff was warned that if JOSEPH CLARK gave you the keys to the jeep and tractor, it was a sign of being specially favored.  In a previous year Brian Reilly was favored by CLARK.  Brian Reilly subsequently left the BROTHERS, got married and then put a bullet in his head and died of suicide.

27.     BR. JOSEPH CLARK molested the plaintiff in the novitiate which was in Esopus, New York in 1971-72.  The plaintiff temporarily left the religious order because of his anxiety over being abused.  Clark would hug the plaintiff and rub himself up and down the plaintiff's body despite the plaintiff's protestations.  The defendant CLARK also flaunted his wealth and power and it was widely known that he was an alcoholic.

28.     During the six months in the novitiate in 1971-72, it became apparent to the plaintiff how dysfunctional the Catholic Church was.  The plaintiff re-entered the order in the summer of 1973 and was sent back to the postulancy for the summer to get acquainted with the group he would be joining in novitiate.  There were many more actively gay Brothers than straight.  Two of the plaintiff's classmates were dismissed during the second novitiate, Henry

Sek and Patrick Sweeney.  Both were found making love in a closet.  It was clear to the plaintiff that he was in a class and Order of significantly more gay than heterosexual men.

29.     There were two older men in plaintiff's first novitiate in 1971-72, Kevin Ridge and Jim Irwin.  Irwin left and became a catholic elementary school teacher and was arrested for possession of internet child pornography a few years ago.

30.     The plaintiff became acquainted with a novice named LAURENCE BOSCHETTO, who was a student and close friend of PAUL HENNESSY.  He would sexually abuse and manipulate the plaintiff over the course of four years.  He also would on occasion offer the plaintiff drugs.

31.     In 1975 the plaintiff received his bachelor's degree and was assigned to teach at St. Cecilia's School in East Harlem, New York City.  Due to the guilt and shame plaintiff felt over the BOSCHETTO abuse, he had difficulty disciplining young children.

32.     At the end of August 1976 the plaintiff moved into Blessed Sacrament High School where approximately eight brothers were stationed.    The day plaintiff moved PAUL HENNESSY telephoned him to ask him if he wanted to play handball and have dinner.  The plaintiff declined and paid for it dearly.

33.     It was agreed amongst the Brothers that Robert C. Post was horrific as a principal and superior at Blessed Sacrament High School.  The plaintiff protested Post's behavior with teenage boys at the school and the plaintiff was transferred out as punishment for his speaking out.  One Brother at the high school was Robert McGovern who later was found abusing a boy in New Jersey.

34.     Sometime later Robert Post left the order to become a priest in Bridgeport, Connecticut and was found to have abused  boys in a high school while there.

35.     During the three years at Blessed Sacrament, LAURENCE BOSCHETTO involved himself in the plaintiff's life.  Each time the plaintiff had to see him, the sexual abuse continued or was attempted whenever they were together.  Plaintiff fell deeper and deeper into depression and anxiety and had very few days that were peaceful.

36.     At the end of the summer of 1979, before moving into Rice High School in Central Harlem, the plaintiff went on vacation.  It was called "sabbatical" summer in which the Brothers were given a sum of money and allowed to go anywhere they wished.  The plaintiff suffered severe anxiety attacks and was ashamed and had suicidal thoughts.

37.     At that time the plaintiff decided to ask for help.  He called a close friend, John Frank O'Brien and started to tell him about the LAURENCE BOSCHETTO abuse, PAUL HENNESSY'S "grooming," JOSEPH CLARK'S abuse and the "climate" of sex, sexuality and abuse that the plaintiff was subjected to, as well as routine cover-up of crimes against children that the plaintiff was personally aware of.

38.     It was Frank O'Brien's opinion that the plaintiff suffered sexual abuse from LAURENCE BOSCHETTO, that he was targeted by some brothers for sexual purposes, that he was not homosexual and that none of the abuse was the plaintiff's fault.

39.     The plaintiff was relieved and since it was getting late in the evening by the time they stopped talking, plaintiff's parents invited Frank O'Brien to stay overnight in their home and he accepted.

40.     The plaintiff went to bed that night feeling that he might fall asleep and sleep through the night for the first time in years, as a burden had lifted.  Sometime during the night the plaintiff was awakened by someone crawling into his bed.  It was Frank O'Brien and he was doing to the plaintiff's body what LAURENCE BOSCHETTO did and exactly as it was

described to him earlier in the day.  The plaintiff's response was to freeze in place as he was stroked up and down.  The plaintiff uttered "Oh, shit, not again."  It was too traumatic for the plaintiff to think about as he lay there in bed with Frank's hands all over his body, including his genitals.

41.    The plaintiff at that time was convinced that one had to be gay in order to be a Christian Brother or priest.  His thoughts were that his closest friend became his fourth of five abusers.  This abuse would last about two years.

42.    Frank O'Brien abused the plaintiff at his parent's home, at Bishop Kearney High School in Rochester, New York, at Bishop Gibbons High School in Schenectady, New York, at Rice High School, hotel rooms and a host of other places, and in other states, including Massachusetts.

43.    While at Rice High School the plaintiff determined that the faculty and staff did not want anything to do with developing curricula that would meet the needs of the students. He requested a transfer in 1981 when he was admitted into a program at Fordham University.

44.    The plaintiff's next assignment took him to Catholic Memorial in Boston. There he met the Vice-Chancellor of the Boston Archdiocese and one time chaplain of the school, Fr. Fred Ryan.  Fr. Ryan was observed as dysfunctional, mentally unstable and hung around the locker room area of the school where students dressed, undressed and showered.  Afterwards Ryan took school boys to his chancery quarters to be inappropriately photographed and sexually assaulted.  On numerous occasions, the plaintiff protested the presence and actions of Fr. Fred Ryan to the school administration, but this was ignored and used against the plaintiff.

45.     During the plaintiff's tenure at Catholic Memorial, two Christian Brothers and one lay teacher were removed for sexual abuse of boys.  The two Brothers were moved and hidden and kept from the police or criminal involvement.

46.     The plaintiff also encountered Benjamin Hopkins who was not only gay, but who was a predator and made overt sexual gestures toward underage boys who were students at the school and the plaintiff.

47.     At about this time the plaintiff continued to suffer panic attacks.  During Easter vacation of 1982, the plaintiff was severely depressed and close to hospitalization.  The plaintiff's parents called Frank O'Brien to see if he could help the plaintiff.  It was ironic that the plaintiff sought out his abuser for help.  The last time Frank O'Brien abused the plaintiff was the day he drove plaintiff back to Boston in 1982.  After that time, the plaintiff made the decision that it would never happen again.

48.     The plaintiff believes he was denied promotions and retaliated against time after time because he would not participate in the homosexual relationships so rampant in the various schools, churches, brothers, priests and supervisors.

49.     Some of the plaintiff's symptoms included:  post traumatic stress disorder, a sense of doom, nightmares, day mares, thoughts of suicide, various neurotic thoughts such as losing control, fear of stabbing someone, fear of driving his car and plowing into people crossing the street, losing control, anxiety and/or panic attacks.

50.     The plaintiff noticed that just as there was a homosexual culture in the Christian Brothers, the homosexual culture by a majority of seminarians in the seminary and Catholic priests was very obvious.  There were many more active homosexuals than heterosexuals.  Some professors were assigned female names to indicate their own "femininity," and one

professor was personally observed to have frequented a local park known for its homosexual liaisons.  That man contracted the AIDS virus and is still teaching in the seminary.

51.     The plaintiff met a seminarian who told him the seminarian wanted help with his obsession with masturbation.  He was removed from ministry after ordination for abusing boy scouts.  At this time the plaintiff also met a seminarian Marc Vicari who repeatedly attempted to have sexual relations with the plaintiff.  Vicari advised the plaintiff that in order to become his friend, the plaintiff would have to become Vicari's "bitch".  Plaintiff repeatedly told Vicari that he had no plans or aspirations to engage in sex with him.

52.     After being a CHRISTIAN BROTHER for over 20 years, the plaintiff was ordained a priest on May 24, 1997 and his first assignment was St. Andrew's Parish, Bayonne, New  Jersey.  The pastor at this parish inappropriately handled a family whose two sons were sexually abused by Fr. Kenneth Martin, telling the plaintiff the family was crazy and simply causing problems for the church.

53.     In 1998 the plaintiff requested a transfer and received it to Holy Trinity in Hackensack, New Jersey.  He was not told that he was replacing a sexual abuser, Fr. Alfonso de Condorpusa, who was dismissed from the Archdiocesan seminary for inappropriate sexual behavior.

54.     The plaintiff learned of the politics within the diocese.  He was on the wrong side of the bishops, including Bishops Charles McDonnell and Paul Bootkoski, who had an inappropriate relationship with de Condorpusa.  As the plaintiff went on in his career, he was not given positions of his choice, promotions deserved, living arrangements of his choice all because he had offended higher ups in the church by refusing sexual advances and sexual favors.

55.     As the plaintiff did more advocacy work on behalf of survivors of sexual abuse, retaliation and the hostile work atmosphere continued.

56.     In early May 2003, the defendant ALBANY DIOCESE received widespread media coverage and the temporary removal of at least 3 priests from ministry due to a lawsuit filed on May 7, 2003.

57.     Within one week of the suit, a district attorney launched a criminal investigation and the priests were removed or left active ministry, causing a barrage of negative publicity and coverage for defendant BISHOP HUBBARD and the defendant ALBANY DIOCESE.  The defendant HUBBARD or his agents retaliated against the plaintiff due to the context and timing of this and other negative publicity in May 2003 and at times prior.

58.     Thereafter, in May 2003, the plaintiff testified at the New York State Senate in Albany, New York on behalf of victims of clergy sexual abuse and in support of legislation for changing the Statute of Limitations Laws in New York which protect sexual predators, both in and out of the church.

59.     In May 2003 when the plaintiff testified before the New York State Senate regarding widespread clergy sexual abuse, the defendant ALBANY DIOCESE and defendant HUBBARD took offense at a priest from downstate that traveled upstate who gave aid and credibility to victims of abuse in the Albany area and to Albany media.

60.     The testimony by an ordained Roman Catholic priest obtained widespread local (Albany) media coverage.

61.     Shortly after the plaintiff HOATSON was invited to testify and did testify before the New York State Senate and same caused a substantial amount of local Albany coverage, which upon information and belief, served to further embarrass and disturb the defendant

HUBBARD.  This served to motivate the defendant HUBBARD to interfere with and harm the plaintiff's career.

62.     In response to his testimony, the defendant HUBBARD or his surrogates contacted the defendant MYERS and the defendant NEWARK ARCHDIOCESE and had the plaintiff HOATSON fired from his position as Director of Schools at Our Lady of Good Counsel Parish in Newark, New Jersey.

63.     Immediately after the plaintiff's testimony, the defendant HUBBARD and his agents in the ALBANY DIOCESE contacted the NEWARK ARCHDIOCESE, reported on the plaintiff's testimony before the New York State Senate and tortiously interfered and had the plaintiff fired from his position with Our Lady of Good Counsel Parish.

64.     The plaintiff's testimony was an effort to provide information to a public body conducting an investigation or inquiry regarding violations of law, or what the plaintiff believed were violations of law and was protected speech and a matter of public safety.

65.     In an effort to punish the plaintiff for repeatedly attempting to aid victims of abuse and for helping to expose predators in the church, the plaintiff was at times forced to live with admitted pedophiles, including but not limited to in West Orange, New Jersey.

66.     The plaintiff is paid a salary by defendant NEWARK ARCHDIOCESE and was and currently is employed as a priest, but was fired as an administrator at said Catholic Schools. The NEW YORK ARCHIDOCESE also contributed and became involved in retaliation and the hostile work environment.

67.     The defendants have engaged in an intentional and long standing practice of intimidating victims of clergy sexual abuse and their advocates including the plaintiff, and a longstanding practice of protecting, assisting and moving around priests who engaged in sexual

13

misconduct or sexual abuse of children, including the defendants, and a longstanding pattern or scheme of protecting priests from being arrested, charged, indicted or convicted for crimes of a sexual nature, as well as a criminal cover-up of same, and have retaliated against, harassed and discharged the plaintiff for exposing same.

**BACKGROUND**

68.     The plaintiff does not concede nor argue that church teachings or Canon Law is applicable or controlling to the claims in this suit, however, documents and studies of the church or by the church are utilized to aid the Court and the plaintiff in detailing the claims set out herein.

69.     Unknown to the public, in 1962, a secret guideline was issued by the Holy Office of the Vatican, now known as the Congregation for the Doctrine of the Faith, to all bishops of the Roman Catholic Church, the Bishops, Archbishops and Cardinals in this case among them, with instructions that this document be kept in the secret archive within each DIOCESE in the United States and the world, including the ARCHDIOCESE OF NEWARK, NEW YORK and THE ROMAN CATHOLIC DIOCESE OF ALBANY and the document was entitled "Manner of proceeding in Cases of Solicitation," or by its official Latin name, *Crimen Sollicitationis*.  The *Crimen* document prescribes secret procedures for processing cases of an especially vile form of clergy sexual abuse:  solicitation of sex during sacramental confession.  But, the document also discusses procedures of other clerical crimes including sex with children and even sex by and between clerics.  The Pope and various regional bishops had issued a series of similar disciplinary laws against solicitation as far back as 1561.  The authenticity of *Crimen* has been the subject of intense examination, including an on-point

deposition of Rev. John Beal, an Associate Professor of Law at Catholic University of America.

70.    Since *Crimen* was never officially published, its "authenticity" in the strictest sense cannot yet be established.  Yet, as the Beal deposition establishes, it has been used by him in scholarly works, official commentaries, and even distributed by him to his students. Thus it possesses sufficient indicia of reliability to allow its introduction in this and other cases. *Crimen* is a virtual "trial manual" on the manner of conducting secret, exculpatory, sham-trials of priest-perpetrators in such a manner as to denigrate the victim's testimony through a series of self-incriminating leading questions that make it virtually impossible for any priest ever to be convicted of the crime of sexual assault of children by a secret church tribunal.  Instead the criminal perpetrator is to be sent on his way to conduct pious pilgrimages while the victim is silenced under a papal secret, never to reveal the conduct of the proceeding for fear of eternal damnation.

71.    The Catholic Church in the United States has always conceded that secular law takes precedence over church teachings.  The documents referenced hereto are indications of the cover-up and protection of ongoing criminal activity.

72.    A Latin reference to "*Crimen Sollicitationis*" was initially discovered in a letter to all bishops of the Catholic Church from the then Cardinal Joseph Ratzinger, now known as Pope Benedict XVI, dated May 18, 2001, and incorporated herein for all purposes.  *Crimen* and its 1922 predecessor were also previously referenced in a footnote to the 2000 supplemental commentaries to the Code of Canon Law, Canon 1388.  The Ratzinger letter confirms that the procedures of *Crimen* have been in effect and known to Bishops such as the defendants in this case from at least 1962 to 2001, most likely earlier, and according to Dr. Beal, still likely to be

in effect.  However, the English version of *Crimen* was not uncovered and made known to the public until its existence was published in *The Washington Post* and in many other national and international newspapers in 2003 and 2004.

73.    In its head note, *Crimen* states that it ". . . is to be diligently stored in the secret archives of the Curia as strictly confidential; nor is it to be published nor added to with any commentaries."  This head note explains the delay Plaintiffs have had in discovering this document.  Further, these and other official church documents will show, at times of trial, that children and other vulnerable persons were considered accomplices in their own abuse, thus providing a warped justification for the conspiratorial conduct involved, including a conspiracy of silence.

74.    Since the archives of the Holy Office, now known as the Congregation for the Doctrine of the Faith, under the control of the then Cardinal Ratzinger, are closed to outside public scrutiny, it is impossible to determine the number of cases involving sexual abuse of children referred to it between 1962 (and probably earlier) and the present.  The other factor impeding a study of such cases is the prohibition of local archdioceses or dioceses from ever revealing the existence of these cases much less the relevant facts.

75.    Although the Court can and may take judicial notice of the widespread public dissemination of clergy sexual abuse cases and stories, the actual and true extent of these cases and the clergy abuse crisis will never be known due to the intentional and ongoing nature of the organized cover-up of these cases from public and secular views.

76.    The public exposure of clergy sexual abuse of children which began in the mid-eighties was mistakenly believed by many to be a new phenomenon to the Catholic hierarchy, but, as *Crimen*, as well as earlier church legislation, clearly demonstrates, it is not.  Deviant

sexual behavior against the vulnerable by Catholic clerics was actually know and its repetition foreseeable by the defendants ARCHDIOCESES and their bishops in this case.  This assertion is based on a consistent pattern of disciplinary legislation such as *Crimen* enacted by church authorities from the fourth century down to the present.

77.     *Crimen* is significant in this case because it reflects the church's urgent desire to maintain the highest degree of secrecy and strictest level of security about the worst sexual crimes perpetrated by clerics against the vulnerable; and the fact that it even exists supports plaintiff's allegation in this case as detailed below, of systemic fraud, fraudulent concealment, misrepresentation and conspiracy to commit and conceal clergy sexual abuse by the Catholic hierarchy, including defendants herein.

78.     With respect to the scope of the conspiracy hereinafter pled, plaintiff respectfully directs the Court to the recently released Research Study conducted by the John Jay College of Criminal justice for the United States Conference of Catholic Bishops ("USCCB"), *The Nature and Scope of the Problem of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States*, dated March 19, 2004.  It reports that for the 53 year period, beginning in 1950, for which data were collected, there were some 4,392 perpetrators and a victim population of 10,667 individuals.

79.     The John Jay Study was accompanied by *A Report on the Crisis in the Catholic Church in the United States* to the USCCB, authored by the National Review Board for the Protection of Children and Young People, dated February 27, 2004.

80.     With respect to the causes of action pled in this case the revelations of the Review Board are compelling.  "There appears to have been a significant surge in acts of abuse in the 1960s and continuing into the mid 1980s.  The fallout resulting from this epidemic of

17

abuse and the shortcomings in the response of a number of bishops and other Church leaders *continues to this day*" (emphasis added). "The bishops acknowledge that 'in the past, secrecy has created an atmosphere that has inhibited the healing process and, in some cases, *enabled sexually abusive behavior to be repeated*'" (emphasis added).

81.     The Review Board places much of the blame for this crisis on what it characterizes as Secrecy and Avoidance of Scandal. In that section of the report, the Board speaks explicitly to the gravamen of the plaintiffs' complaints in this case.

> Time and again church leaders failed to report incidents of possible criminal activity to the civil authorities. In fairness, at the time, church leaders typically were not required to report allegations of sexual abuse of minors to civil authorities. In addition, civil authorities often showed little interest in receiving information about cases that were beyond the statute of limitations. But it is clear in hindsight that the Church could have prevented numerous acts of sexual abuse had its leaders reported all allegations of sexual abuse by priests. *Where the evidence warranted, offenders could have been prosecuted and punished before they were able to perpetuate their misconduct; and by their example, other priests could have been deterred from engaging in similar misconduct.*
> *Id*. at 110 (emphasis added).

82.     Unknown to and unreported by the Review Board, the "church leaders" to which it refers extends beyond the United States. The John Jay study is incorporated herein by reference as is a letter of the Ratzinger defendant specifically directed at all bishops of the Catholic Church, including but not limited to the defendants. It is conspiratorial on its face in that it (a) combines protected First Amendment activities (consecration of sacred materials) with constitutionally unprotected criminal activities (clerical sexual assault), (b) attempts to apply its exclusive jurisdiction and procedures to both these types of acts, (c) applies explicit principles of exclusive clerical control and "pontifical secrecy" to its own

proceedings, (d) controls and keeps secret the records (Acts) of its secret proceedings, and (e) extends its period of exclusive control and secrecy in the criminal matters to the age of the victim at age 18 plus ten years in order to defeat intentionally most criminal statues of limitations.  Given the information in the *Beal* deposition, the issue date of the Ratzinger instruction, May 18, 2001, adds further corroboration to its conspiratorial intent.  Upon information and belief, and upon examination of the so-called enabling legislation by the Pope, internally referenced, the acts of the Ratzinger defendant are *ulta vires, i.e.*, outside the scope of authority given to him by the Pop but well within his personal power to effectuate.

83.     Also unknown to the citizens of New York and New Jersey was the participation of the defendants in a conspiracy with other archdioceses.  Indeed, recycling rejected clerics is a recognized pattern of fraudulent deception that is systemic in the Roman Catholic Church.  As their own audit conducted by the John Jay School of Justice (and released in 2004) states:

> Aspects of the failure to respond properly to sexual abuse of minors by priests included: (i) inadequately dealing with victims of clergy sexual abuse, both pastorally and legally; (ii) allowing offending priests to remain in positions of risk; *(iii) transferring offending priests to new parishes or other DIOCESES without informing others of their history;* (iv) failing to report instances of criminal conduct by priests to secular law enforcement authorities, whether such report was required by law or not; and (v) declining to take steps to laicize priests who clearly had violated canon law.

## THE ONGOING CONSPIRACY

84.     During and after the sexual abuse at issue in this case, the defendants' tortious conduct continued.  In that regard, in addition to the so-called "Ratzinger Instruction," a/k/a *Ad Exequandam*, and its internally

referenced "On the Manner of Proceeding in Cases of Solicitation," a/k/a *Crimen Sollicitationis*, additional actions have been taken to affirmatively misrepresent to the public that its children are safe from the cover-up mentality which lies at the core of the tortious conduct addressed in this suit.  In the summer of 2002, the National Conference of Catholic Bishops met in Dallas to fashion what they call, even today, their "Charter for the Protection of Young People" in which they promise to cooperate with civil law enforcement and stop the cover-up of priests' criminal conduct.  However, the "Charter" had to be approved in "Rome" – enter again the Ratzinger defendant.

85.    In December 2002, the "Charter" went to Rome for a "recognition" or approval in a form that stated the American bishops would inform "Rome" of a criminal case and then be told "to proceed."  What emerged was the so-called "Essential Norms," engineered by the Ratzinger defendant, with control of bishops' conduct noticeably lacking, in which the critical word "how" now controls, i.e., inform Rome and Rome will tell you "how to proceed."    The "Essential Norms" are not attached hereto, but will be incorporated herein by reference.  At Par. 8A therein, the reference to "how" and the May 18, 2001 Ratzinger letter is clearly set forth.  Then the devil always has been in the footnotes, as footnote 7 is stated, "{t}he necessary observance of canonical norms internal to the church is not intended in any way to hinder the course of any civil action that may be operative.  At the same time, the Church reaffirms her right to enact legislation binding on all her members concerning the ecclesiastical dimensions of the <u>delict</u> of sexual abuse of minors."   In this

regard, two prominent people recently departed the service of the church in the "clergy sex abuse crisis" in the following manner.

86.     On his departure, Governor Frank Keating compared some bishops to the mafia in their devotion to secrecy. Gov. Keating was replaced as chair of the so-called "National Review Board" by Justice Anne M. Burke of the Illinois Appellate Court who completed her term but did not wish to be reappointed and she did not serve another term in her post out of frustration in the fact of "business as usual," a decision to "backslide on the Charter and Norms . . ." Governor Keating and Justice Burke's comments are incorporated herein by reference.

87.     Thus of critical consequence to this case is the clear demonstration that the church's public representations that children are currently safe from its priests anywhere is deliberately false and misleading and constitutes an ongoing danger to the public.

## AS AND FOR THE FIRST CAUSE OF ACTION

88.     Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

89.     This cause of action is for a violation of the New Jersey Statutory and Common Law and whistleblower laws and/or unlawful retaliatory action against all of the defendants jointly and severally.

90.     The plaintiff is a protected whistleblower who is being retaliated against and punished for speaking out against predators in ministry which involves public safety and health, the hierarchy and bishops in the Catholic Church and for aiding and assisting victims of clergy sexual abuse in his employment.

91.    The defendants and notably the defendant ARCHDIOCESE OF NEWARK with the aid and cooperation of the defendants ALBANY DIOCESE, NEW YORK ARCHDIOCESE and the leaders of the CONGREGATION CHRISTIAN BROTHERS and bishops have retaliated against, and punished the plaintiff in his career, profession and livelihood.

92.    The plaintiff has spoken out publicly and to legislative bodies conducting a hearing, with the intent and purpose of protecting children and those harmed by abusive priests and religious.

93.    The law prohibits any employer from taking retaliatory action against an employee when the employee

(a)    discloses what the employee ". . . reasonably believes is in violation of the law . . .";

(b)    testifies before " . . .any public body conducting an investigation . . . "; or

(c)    objects to participate in any activity which is incompatible concerning public health or safety (NJSA) 34:19 – 3, also commonly known as the N.J. "Whistleblower Act."

94.    The defendants have with malice, and with the intent to preserve, protect and defend the church, their own credibility, and the prestige of their positions and to hide stories of the victimization of children, served to punish or retaliated against the plaintiff for appearing to speak out for victims of clergy sexual abuse which has been wrongly perceived as against his own employer and the defendants.

95.     The defendants have been motivated to retaliate against the plaintiff, to protect predatory priests and religious due to a widespread and rampant subculture and culture of homosexuality within the priesthood, clergy, religious life and with bishops.

96.     Although the plaintiff accepts, recognizes and supports all basic civil, human and homosexual rights, clergy and religious life have a far greater percentage of actively homosexual men in ministry than that of celibate and/or heterosexual men, and the subculture or climate in ministry or religious life for the plaintiff has been discriminatory.

97.     Due to the fact that there is far in excess of half of all priests and religious in the United States who are active homosexual, the climate has existed that pedophiles and/or predators have been able to infiltrate ministry or religious life and have been protected, defended, supported, moved around and kept in ministry by bishops due to a reciprocal type of blackmail.  Pedophiles and predators in ministry and religious life have successfully sexually abused children for decades because of or due to the fear of exposure of actively homosexual bishops, archbishops, cardinals and a massive amount of and high percentage of actively homosexuals in ministry.  The plaintiff has acted to expose this hypocrisy that has and continues to endanger children and has been retaliated against because of this.

98.     The plaintiff, upon information and belief, alleges the defendants MYERS, EGAN and HUBBARD are actively homosexual, as well as Cardinal Theodore McCarrick of Washington, D.C., who the plaintiff previously worked for and under, as well as leaders in the Brothers.  The plaintiff has personal knowledge of this and states that consensual, adult and private sexual behavior by and amongst these defendants is not an issue or at issue.  The issue for the plaintiff is that this behavior has compromised the defendants' ability to supervise and control predators, and has served as the reason for the retaliation and harm repeatedly done to

the plaintiff and the plaintiff's career in exposing predators and helping victims of clergy sexual abuse.

99.    Due to the fact that the defendants MYERS, EGAN and HUBBARD along with McCarrick and leaders in the Brothers are or have been actively engaged in homosexual lifestyles, these bishops have been compromised in their positions and status as employers by predators and pedophiles in ministry and motivated to retaliate against the plaintiff for exposing criminal acts, corruption, immorality, hypocrisy and criminal acts by predators and amongst bishops.

100.    The defendants have acted to retaliate against the plaintiff's whistle blowing and/or protected actions in an effort to protect themselves, protect their lifestyles, and protect the culture of secrecy with respect to an overwhelmingly greater proportion of homosexuals in ministry, than celibate or heterosexual priests, and ultimately to protect, enable and aid predators or pedophiles in ministry or religious life, or those who have left the church for these reasons at the expense of children, the vulnerable and/or the plaintiff.

## AS AND FOR THE SECOND CAUSE OF ACTION

101.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

102.    The defendant NEWARK ARCHDIOCESE and defendant MYERS are jointly and severally liable to the plaintiff for this cause of action of intentional infliction of emotional distress.

103.    In the last year, the defendants have engaged in extraordinary and extreme acts of malice and outrageous actions toward the plaintiff.

104.    The plaintiff has dedicated his career to aiding victims of clergy sexual abuse and in response, the defendants have intentionally acted in a manner to punish, harass, harm

and/or exact retribution against the plaintiff because of a perceived failure to protect other priests, religious and bishops.

105.    The culmination of the punishment and intentional harm exacted upon the plaintiff has been memorialized in sanctions and punishment in 2005 from defendant ARCHBISHOP JOHN J. MYERS.

106.    The defendants' conduct was and has been extreme and outrageous and was intentional or done with a reckless disregard for the welfare of the plaintiff, and was done because the plaintiff was and is a person who complained about sexual abuse by clergy and has stood up and supported victims of clergy sexual abuse.

107.    The defendants' acts were and are wanton and careless and in the past year have targeted the plaintiff with these actions.

108.    By engaging in a clear pattern and ongoing activity of egregious behavior herein described, and in lieu of the sexual abuse experienced, witnessed and reported by the plaintiff, the defendants intended to inflict distress upon the plaintiff and should have known that the emotional distress would likely occur.

109.    The defendants engaged in a series of reckless acts which has proximately damaged the plaintiff.

110.    The defendants' acts, when viewed in their entirety, consisted of a pattern of reckless and careless acts.

111.    That such actions above described by the defendants is shocking to the conscience of right-thinking persons in the community and damages were proximately caused to the plaintiff by all defendants' conduct.

112.    As a result of defendants' conduct, the plaintiff experienced and continues to

experience severe emotional distress proximately caused by the defendants' actions.

113.    The defendants each have displayed extremely reckless conduct and deception towards the plaintiff.

114.    As a result of the above-mentioned conduct, plaintiff has suffered and continues to suffer great pain of mind, body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self esteem, disgrace, humiliation, and loss of enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## AS AND FOR A THIRD CAUSE OF ACTION

115.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

116.    The defendant HUBBARD, defendant ALBANY DIOCESE, defendant EGAN and defendant NEW YORK ARCHDIOCESE are jointly and severally liable to the plaintiff for this cause of action for tortuous interference and/or tortuous interference with the plaintiff's employment.

117.    The defendants in or around May 2003 made repeated contact and communication with the defendant MYERS and defendant NEWARK ARCHDIOCESE in an effort at disciplinary action, punishing and firing the plaintiff.

118.    The defendants had notice or constructive notice that the plaintiff was a NEWARK ARCHDIOCESAN priest who had come to the Albany area to testify at the New York State Senate to give testimony that supported victims of abuse and helped to expose predators in ministry.  In addition, the defendant EGAN and defendant NEW YORK ARCHDIOCESE at or about that time acted to retaliate or damage the plaintiff.

119.    The defendants had a duty to the plaintiff and breached their duty of care to the plaintiff, by engaging in negligent or egregious behavior, which proximately caused the plaintiff's damages.

120.    The defendant HUBBARD'S, defendant ALBANY DIOCESE'S, defendant EGAN'S and defendant NEW YORK ARCHDIOCESE'S actions breached a duty of care and foreseeably caused or resulted in improper and retaliatory disciplinary action against the plaintiff, which included the plaintiff's retaliatory termination from his job caused by these defendants' actions.

### AS AND FOR A FOURTH CAUSE OF ACTION

121.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

122.    The defendants CHRISTIAN BROTHERS, NEWARK ARCHDIOCESE, the defendant priests and brothers and the NEW YORK ARCHDIOCESE and defendant EGAN are jointly and severally liable for the sexual abuse of the plaintiff that occurred in the 1970s.

123.    In January 2006, the New York State Court of Appeals in *Zumpano v. Quinn* is reviewing and has allowed argument regarding sexual abuse by a priest that occurred decades ago in order to determine whether the claims are time barred and whether under the doctrine of equitable estoppel, the defendants can utilize the Statute of Limitations defense.

124.    The defendants CHRISTIAN BROTHERS and the actual tortfeasors are responsible jointly and severally for the repeated and persistent sexual abuse of the plaintiff and await the ruling in *Zumpano* on this cause of action.

125.    As a result of defendants' negligent conduct, the plaintiff has proximately suffered injuries and damages described within.

## AS AND FOR THE FIFTH CAUSE OF ACTION

126.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

127.    All of the defendants jointly and severally are liable to the plaintiff for this RICO cause of action, and each defendant is an agent of each other defendant and each defendant is a coconspirator with the other relating to the acts alleged herein.

128.    The plaintiff FR. ROBERT HOATSON has spoken out against clergy sexual abuse, has assisted victims of clergy abuse, and has worked to expose sexual abusers in the priesthood/religious life, and the defendants have punished, penalized and retaliated in these actions of the plaintiff HOATSON.

129.    The criminal conspiracy and criminal predicate acts all relate to actions of and toward the plaintiff over his tenure as a priest and/or brother.

130.    Defendants agreed to enter into a conspiracy to violate provisions of 18 U.S.C. § 1962 et seq., as described above. As evidence of this agreement, the plaintiff is aware that the defendants conspired to commit and cover up crimes, to falsely and maliciously have the plaintiff fired or constructively discharged to conceal defendants' sexual misconduct, engaged in a pattern of illicit activity, or aided and abetted in concealing the activity and defendants conspired with each other to evade and/or aided and abetted defendants in evading public embarrassment and civil or criminal liability related thereto, as well as engaging in a scheme or pattern of conduct of illegally protecting, hiding and moving sexually abusive priests and the cover-up of same.

131.    The defendants are persons or entities under 18 USC § 1961 (3).

132.    The relationship by and between the defendants constitutes an association in fact enterprise under 18 USC § 1961(4) and 1962 et seq., and each of the defendants were coconspirators with each other.

133.    The relationship between the defendants constitutes an association in fact enterprise under USC §1961 (4) and the persons controlling or directing the affairs of the defendant DIOCESE or the enterprise and have engaged in a pattern of activities of a conspiracy and racketeering activity in violation of 18 USC § 1962, et seq.  The defendant MYERS, EGAN and HUBBARD all exhibit and exercise control over the enterprise.

134.    Under a civil RICO, it is unlawful to participate in the conduct of an enterprise's affairs through a pattern of racketeering or to conspire to violate substantive provisions of 18 USC § 1962 et seq.

135.    Under 18 USC 1962 (c), (d) and under 1964 a private right of action was created for individuals to enforce the RICO Statute.

136.    The enterprise, the defendant DIOCESES and/or the defendants engaged in activities which affected interstate or foreign commerce and the alleged conduct has been committed in a pattern of racketeering that has injured the plaintiff.

137.    The enterprise has and has had continuity of structure and a shared and common purpose and the scheme or pattern of protecting, hiding and moving sexually abusive priests has been going on for decades.

138.    The defendants maintained and exercised control over each other and the enterprises alleged.

139.    There is and has been a relationship by and between the defendant DIOCESES including but not limited to sharing in the hiding, concealing and employing of sexually

abusive priests/religious, and using one diocese to gather or gain information on or about the plaintiff in order to punish, retaliate against or constructively discharge the plaintiff HOATSON.

140.    By way of example, the defendant ALBANY DIOCESE in May 2003 contacted the defendant NEWARK ARCHDIOCESE after the plaintiff HOATSON testified before the New York State Senate in Albany, New York and complained about the plaintiff whereupon the plaintiff was punished, retaliated against and fired for speaking out against clergy sexual abuse and in support of victims of abuse.

141.    Alternatively, the relationship between the defendants with the defendant DIOCESES constitutes an association in fact enterprise under 18 USC § 1961 (4) and the persons controlling or directing the affairs of the enterprise  have engaged in activities or a pattern or practice of conspiracy and racketeering activity in violation of 18 USC § 1962 et seq.

142.    Racketeering activity may be defined as acts indictable under federal law, including predicate mail and wire fraud, as well as a criminal conspiracy and violations of insurance law and laws protecting the trafficking in child  pornography and taking children across state lines for purposes of sexual abuse.  18 USC § 1341, § 1343, the Hobbs Act § 1951, § 1961(1) (b), and the "Protection of Children Against Sexual Exploitation Act of 1977" or 18 USC § 2251, et seq.

143.    The plaintiff has and will further set out with requisite specificity, dates and times of calls, letters and contact by and between the parties.  Calls and communication by and between the ALBANY DIOCESE and NEW YORK ARCHDIOCESE with the NEWARK ARCHDIOCESE are calls that involve communications by wire in interstate or foreign commerce furtherance of the scheme to defraud or injure the plaintiff.

144.    The defendants also engaged in a criminal conspiracy to institute false charges against the plaintiff and did, in fact, act to further falsify charges in order to harm and dissuade this and other victims of clergy abuse and their supporters.

145.    Each of the defendants performed overt acts or took steps in furtherance of their activity.

146.    The defendants DIOCESES and/or the defendants MYERS, HUBBARD and EGAN constituted an actual enterprise as required by statute, and that each of these defendants has engaged in two or m ore predicate acts.

147.    The enterprise engaged in activities, which affected foreign commerce or commerce associated with the plaintiff and have engaged in the crimes of extortion and attempted extortion of the plaintiff in an effort to silence and stop the lawful and legitimate acts of the plaintiff.

148.    The defendants DIOCESES and the defendants are persons controlling or directing the enterprise and the affairs or have engaged in or joined in a conspiracy to intentionally, recklessly and/or negligently conceal criminal conduct of its agents, aid and abet the concealment of criminal conduct, aid and abet criminal sexual conduct, fail to report criminal conduct of its agents, obstruct justice, obstruct criminal investigation, obstruct state and/or local law enforcement, evade criminal and/or civil prosecution and liability, pay or offer to pay money to victims in order to keep its criminal conduct secret, violate the civil rights of children, families and vulnerable adults, engage in mail and/or wire fraud, and commit fraud and/or fraudulent inducement of its parishioners in furtherance of its scheme to protect predatory priests and other clergy from criminal and civil prosecution, to maintain or increase

charitable contributions and/or avoid public scandal in the Roman Catholic Church or the defendants DIOCESES.

149.    The persons controlling or directing the affairs of the enterprise and defendant DIOCESES as well as defendants MYERS, HUBBARD and/or EGAN knew that Roman Catholic clergy were sexually abusing and exploiting children and vulnerable adults and they showed willful indifference and/or a reckless or intentional disregard for these persons in order to further their scheme, and at the same time sought out to punish, retaliate against and/or constructively discharge the plaintiff HOATSON.

150.    In 1985, the defendants MYERS, HUBBARD and/or EGAN and the National Conference of Catholic Bishops, received a report titled "The Problem of Sexual Molestations by Roman Catholic Clergy."  This report described the continuing and growing problem of sexual abuse, and according to the report, if the Roman Catholic Church failed to embrace the problem of its predatory priests and clergy; the church could face liability in excess of $1,000,000,000.00 (One Billion Dollars) over ten years.  In addition, the report outlined steps that the Roman Catholic Church, through the National Conference of Catholic Bishops and/or the defendants MEYERS, HUBBARD and/or EGAN must take to protect the church and parishioners from the devastating effects of molesting priests and the cover-up of same.  In response, the defendants and the National Conference of Bishops ignored the report and recommendations and, instead, continued providing a fertile environment for molesting priests, as well as continuing a general pattern and practice for the cover-up of these acts as the church tried to protect its credibility and reputation so as not to lose parishioners and contributions to the church.

151.    Upon information and belief, the enterprise and defendant DIOCESES have engaged in the racketeering activity described above in order to protect financial interests of the defendants in addition to protecting predatory priests and other clergy from criminal prosecution and civil liability and the other aspects of the scheme described above.

152.    The defendants MYERS, HUBBARD and/or EGAN have had a particular interest and involvement in this area as the defendant HUBBARD sits on the National Ad Hoc Sexual Abuse Committee of the National Conference of Bishops.

153.    By way of background, at the June 2002 Conference in Dallas, Texas, the defendant HUBBARD was the national and leading outspoken critic of a "zero tolerance" policy for sexually abusive priests and instead called for a case by case analysis as a way of shielding or protecting sexually abusive priests.  The defendant HUBBARD'S case by case analysis was requested because, upon information and belief, the defendant HUBBARD was aware that it would be very rare for two separate victims to come forward against one of his priests, and he could, therefore protect the massive numbers of abusive priests in the defendant ALBANY DIOCESE by attempting to insist that the sexual abuse was only one isolated incident.

154.    In the same report described above, the reporter cautioned the National Conference of Catholic Bishops to resist the practice by some to sanitize or purge the secret files of potentially dangerous material regarding sexually abusive priests.  In addition, the reporter warned the National Conference of Catholic Bishops, including the defendant HUBBARD, that their practice of moving files containing potentially dangerous material to the Apostolic Delegate (delegate to the Vatican where the files would be immune from subpoena) could ultimately destroy the immunity enjoyed by the Holy See.  These warnings were not

heeded, and particularly not by the defendant HUBBARD who concealed files, warnings and information about the defendants and other abusive priests.

155.    In furtherance of its scheme and enterprise to protect molesting priests and other clergy from criminal prosecution and civil liability, maintain or increase charitable contributions and/or avoid public scandal in the Roman Catholic Church and the NEWARK, ALBANY and NEW YORK DIOCESES, persons controlling or directing the affairs of the defendant DIOCESES intentionally and fraudulently engaged in the routine practice of maintaining secret "sub secreto" archival files of sexual misconduct by priests.  These sub secreto files are accessible to the Bishops only.  The existence of these secret files and the contents were not disclosed to or made available to law enforcement authorities, or others, in order to restrict or inhibit law enforcement to investigate the known crimes or sexual misconduct of the priests.

156.    In fact, it is the practice of the defendants MYERS, HUBBARD and/or EGAN and the Roman Catholic Church to fraudulently purge the files and hide them from persons, including law enforcement authorities, seeking access to them so as to engage in the regular scheme or practice to keep sexually abusive priests out of and protected from our criminal justice system.  Former district attorneys, including Albany District Attorney Paul Clyne publicly stated in April 2002 that he would not seek or try to access these files which document widespread pedophilia in the defendant ALBANY DIOCESE, and district attorneys such as Robert Morganthau who have acted and spoken similarly.

157.    As evidence of this fraudulent practice and its widespread use, in 1990, in an address by Bishop A. James Quinn to the National Conference of Catholic Bishops, including the defendants MYERS, HUBBARD, EGAN and Bishop Quinn stated:

Nevertheless, personnel files should be carefully examined to determine their content.  Unsigned letters alleging misconduct should be expunged.  Standard personnel files should contain no documentation relating to possible criminal behavior.  Serious moral questions, signed allegations, those should be part of the secret file anyhow.  But they still subpoena them.  But comb though your files.

Now what files have been subpoenaed, they cannot be tampered with; destroyed, removed; that constitutes obstruction of justice and contempt of court.  Prior, however, thought and study ought to be given if you thing it's going to be necessary; if there's something there you really don't want people to see you might send it off to the Apostolic Delegate, because they have immunity to protect something that is potentially dangerous, or that you consider to be dangerous, you might send it there.

The Apostolic Delegate is the delegate from the Vatican and Holy See who the church nationally and in the ALBANY DIOCESE believes enjoys sovereign immunity from lawsuits and subpoenas.

158.    In furtherance of its scheme, persons controlling or directing the affairs of the Enterprise and defendants DIOCESES and/or MYERS, HUBBARD and/or EGAN have routinely entered into secret settlement agreements with confidentiality provisions that required victims of sexual abuse to preserve the Bishop's secrets from scrutiny by the public and law enforcement authorities.

159.    In furtherance of the scheme, persons controlling or directing the affairs of the Enterprise, the defendants DIOCESES and defendants MYERS, HUBBARD and/or EGAN illegally bribed victims of sexual exploitation and abuse in order to influence them to not report the sexual exploitation and abuse to law enforcement authorities and ultimately to influence the victims to not testify in court, against the members of the Enterprise, the defendants

DIOCESES and/or MYERS, HUBBARD and EGAN.  As and for proof of that

fact, not one defendant ALBANY DIOCESE priest has been convicted and

sentenced to any substantial jail time or incarceration over the past 53 years,

despite the massive extent of sexually abusive priests that have been exposed or

revealed in the last two years, and similarly the avoidance of criminal sanctions

for widespread pedophilia and sexual abuse of children have occurred in the

NEWARK and NEW YORK ARCHDIOCESES.

160.    As a result of the acts of persons controlling or directing the affairs of the

Enterprise, defendant DIOCESES and/or MYERS, HUBBARD and/or EGAN intentionally,

showing willful indifference and/or with reckless disregard, maintained a web of predatory

priests who perpetrated criminal acts of sexual abuse throughout the NEWARK, ALBANY

and/or NEW YORK DIOCESES over at least a forty (40) year period of time.  Persons

controlling or directing the affairs of the defendant DIOCESES maintained this web by making

fraudulent representations, concealing criminal activity, obstructing justice and criminal

investigations, evading civil and/or criminal liability, bribing and/or payment of money to

victims in order to keep its criminal conduct secret, violating civil rights of children and

families, and committing mail and wire fraud.  There is substantial evidence that persons

controlling or directing the affairs of the Enterprise and the defendant DIOCESES and

ARCHDIOCESES committed a continuing pattern of racketeering activity in furtherance of its

scheme by engaging in fraudulent conduct.

161.    The above actions of the defendants constituted a plan or pattern of continued

actions committed with the intent to deny the plaintiff property, or civil rights, as well as that

many other victims of clergy sexual abuse.

162.     Defendants conspired to and did take specific acts to conceal the misconduct perpetuated by defendants and attempted to block the instituting of complaints of sexual abuse against the defendants, which is itself a crime or a conspiracy to commit a crime.  Those specific acts included racketeering and conspiracy of an ongoing nature.

163.     Defendants conspired with each other in furtherance of the activity to frustrate the legitimate claims of plaintiff, and to damage the career, business and property to a property of the plaintiff.

164.     The use of retaliatory, hostile and discriminatory acts of the defendants to further the defendants' nefarious actions is and was particularly troubling in light of their position of trust with children, power and influence of a church.

165.     The defendants took numerous predicate acts or steps in furtherance of their criminal conspiracy including, but not limited to:

a)     filing false charges against plaintiff;

b)     fabricating false charges against plaintiff;

c)     attempting to "build a file against the plaintiff";

d)     creating a hostile work environment for the plaintiff;

e)     retaliating against the plaintiff;

f)     punishing the plaintiff for exposing and reporting predators and for working for and with victims of abuse;

g)     using the telephone lines and mail to mislead the plaintiff in an effort to have him damaged;

h)     by engaging in a series of these acts which constituted a pattern, including but not limited to conspiring with each other and other persons to attempt to tell or

enhance a consistent set of retaliation, lies or deceptive acts in order to have the plaintiff falsely charged;  and

      i)  in engaging in such other illegal predicate criminal acts consisting of protecting sexually abusive priests.

 166. The defendants' criminal conspiracy is a continuing practice of an ongoing nature, from the beginning of the plaintiff's career continuing and into 2002, 2003, 2004 and 2005.

 167. Plaintiff was injured in his business and/or property, as alleged herein, by reason of the above violation of 18 U.S.C. § 1962 (d).  The plaintiff was specifically compelled to be fired as a teacher and director from two Catholic schools and/or constructively discharged because he was charged with helping victims of abuse.

 168. The plaintiff has clearly demonstrated damages to his business, career and livelihood in that he had to leave school and lost his administrative position due to being falsely charged and accused by the defendants.

 169. The defendants engaged in repeated and a series of criminal actions as and towards the plaintiff and others in setting into motion false charges against the plaintiff which occurred over many months and constitutes a pattern or plan.

 170. The defendants specifically used telephone lines and the mail and made false misrepresentation with the plaintiff in an effort to build or substantiate false charges or building a file against the plaintiff.

 171. The defendants conspired to have the plaintiff investigated on false charges, or made false claims against the plaintiff due to his actions viewed by the church defendants as disloyal acts.

172.    The defendants have concealed other New York State and Federal crimes that have proximately damaged the plaintiff.

173.    This RICO action alleges the necessary predicate for injury to the plaintiff including, but not limited to:

a)    damage by having to cease being a school administrator because of acts caused by the defendants;

b)    damage to his career; and

d)    damage to his career and employment prospects over a 30-year period of time that continues to the present.

174.    This RICO action alleges the requisite pattern as the plaintiff has alleged with specificity that the defendants over a period of time by alleging:

a)    prosecuting or advancing false charges against the plaintiff, retaliating against the plaintiff;

b)    in soliciting or using confederates including defendants;

c)    in attempting to protect and conceal criminal behavior and improper acts of the defendants;

d)    in engaging in a pattern of other activities above described that consisted of a conspiracy by numerous parties to deprive the plaintiff of a property right or his liberty by being charged, harassed and /or retaliated against, all of which was done in connection with the co-defendants and all intended to have the same harmful and dangerous effect on the plaintiff; and

e)    in engaging in these predicate acts over a long enough period of time to demonstrate a pattern.

175.    This RICO action entails the element of racketeering and the court is respectfully requested to take judicial notice of the historic and endemic problems of sexually abusive priests in the NEWARK ARCHDIOCESE, **A**LBANY DIOCESE, the BROTHERS and the NEW YORK ARCHDIOCESE in which was described publicly that approximately 5% to 6.5% of all priests in a 53 year period have been accused.

176.    The element of racketeering has also been properly pled in that the defendants have used the mail and telephone lines to engage in their alleged conduct, and said conduct has been alleged to be criminal and giving rise to civil RICO claims.

**<u>Alleged Criminal Conduct</u>**

177.    As and for another example that demonstrates a practice and longstanding pattern of criminal, illegal and/or racketeering activity is the moving of predatory priests for the intentional purpose of evading criminal prosecution, violating the civil and other rights of the plaintiff and of other aspects of New York's Penal Laws.

178.    The defendants have also engaged in such illegal practice or scheme to either generate income or to conduct business affairs without the embarrassment or loss of credibility that the exposure of same would result in.

179.    The defendants' racketeering is also substantiated by the defendants' attempt to raise millions of dollars from parishioners while at the same time concealing or protecting criminal actions of sexually abusive priests or the defendants MYERS, HUBBARD and/or EGAN who protects them.

180.    The defendants' practice of utilizing law enforcement and district attorneys to insulate or protect abusive clergy or to intimidate victims or witnesses of clergy sexual abuse is another example of the defendants' pattern of illegal and racketeering activity.

## AS AND FOR THE SIXTH CAUSE OF ACTION

181.   Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

182.   The defendants are liable to the plaintiff for this cause of action for breach of fiduciary duty.

183.   Acting in a fiduciary capacity, defendants encouraged plaintiff to be trained in and work as a priest/religious with the defendants.

184.   By engaging in the egregious and explicit behavior described above, defendants breached their fiduciary duty owed to the plaintiff as follows:

        a)      defendants violated the trust and confidence reposed in them by the plaintiff;

        b)      defendants harassed, intimidated and retaliated against the plaintiff due to the plaintiff's efforts at exposing predatory priests/religious and helping or working with victims of clergy abuse;

        c)      defendants utilized their status and role as the plaintiff's employer and trusted person to obtain an unfair advantage over the plaintiff.

        d)      defendants exercised undue influence and control over the plaintiff.

185.   Defendants also breached a fiduciary duty to plaintiff because defendants knew of and allowed the illicit activities and/or criminal cover-up of same to continue without inquiry or question, despite being on notice.

186.   The defendants are in a trusted position of power with the plaintiff, and have utilized that power and authority to the detriment of the plaintiff.

187.   As a direct and proximate result of defendants' breach of fiduciary duty, the

plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries; financial expenses for medical and therapeutic care and treatment; long term lost earning capacity; as well as other damages.

### AS AND FOR THE SEVENTH CAUSE OF ACTION

188.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

189.    This cause of action against the defendant NEWARK ARCHDIOCESE and defendant MYERS for illegal retaliation and a violation of Title VII of the Civil Rights Act of 1964 for discrimination based on his sexual orientation, that is the repeated, unwanted retaliation for not being or participating in homosexual activities that has been requested of the plaintiff, and that is customary and commonplace in the priesthood or religious life.

190.    The discrimination has been illegal and is based on the plaintiff's heterosexual orientation.

191.    The above actions by the plaintiff's employer have been illegal and retaliatory and have proximately caused the plaintiff damages.

### AS AND FOR THE EIGHTH CAUSE OF ACTION

192.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

193.    This cause of action against the defendant NEWARK ARCHDIOCESE and defendant MYERS is for a hostile work environment.

194.    The above action has created a hostile work environment such that the plaintiff has been targeted, and blamed for actions that are solely due to the plaintiff's work on behalf of, and to help victims of clergy sexual abuse.

195.    The above acts have served to act as a hostile work environment.

196.    Sexual discrimination in this context is a hostile and retaliatory work environment that exists and has existed in the plaintiff's chosen career and profession that has stereotyped a straight heterosexual male as a person who has been and is discriminated against by the defendants.

197.    The defendants have engaged in adverse employment actions against the plaintiff which are actionable, and have caused injury.

### AS AND FOR THE NINTH CAUSE OF ACTION

198.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

199.    This cause of action against the defendant NEWARK ARCHDIOCESE and defendant MYERS is for illegal discharge.

200.    The defendants discharged the plaintiff from his job as school director for an ARCHDIOCESE OF NEWARK School, and have thus harmed his employment and career.

201.    On or about May 20, 2003, approximately three days after his testimony in the New York State Senate concerning changing the laws as they apply to sexual abuse by clergy, the defendant MYERS and ARCHDIOCESE OF NEWARK fired the plaintiff from his job as Director of Schools at Our Lady of Good Counsel and said termination was effective immediately.

202.    The defendant NEWARK ARCHDIOCESE has discharged the plaintiff in an illegal and retaliatory manner which has proximately damaged the plaintiff.

203.    Within one week after the filing of this lawsuit, the defendant NEWARK ARCHDIOCESE and defendant MYERS once again exacted illegal retaliation against the plaintiff by firing him from his part time weekly mass services.

204.    The defendants did so by notifying parishioners and not even notifying the plaintiff until several days after notifying parishioners and the public.  This was done to further embarrass and/or humiliate the plaintiff and as further injuries and illegal retaliation.

**WHEREFORE,** the plaintiff respectfully requests FIVE MILLION DOLLARS ($5,000,000) in damages; for attorney's fees awarded by Statute, treble damages provided by RICO § 1964 (c), punitive damages and for such further and other relief the Court deems just and equitable.

DATED:  NEW YORK, NEW YORK
            JANUARY 10, 2006


                                          Yours etc.,


                                          _____
                                          JOHN A. ARETAKIS
                                          (JA 7925)
                                          Attorney for Plaintiff
                                          FR. ROBERT M. HOATSON
                                          353 East 54th Street
                                          New York, New York 10022-4965
                                          (212) 751-7853
                                          Facsimile (518) 286-3065